IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KYLE LAWRENCE STOKKE, <br> PLAINTIFF, | CASE NO. 1:19-CV-27 |
| | **FIRST AMENDED PETITION AT LAW AND JURY DEMAND** |
| MONTGOMERY COUNTY MEMORIAL HOSPITAL, DAVID EARL ABERCROMBIE, PHYLLIS DRAKE, KASEY MUELLER, KIMBERLY ROBINSON <br> DEFENDANTS. | |

COMES NOW Plaintiff, Kyle Lawrence Stokke, and for his causes of action, states as follows:

## RELEVENT LAW

1.      The action for Defamation is based on the provisions of Restatement (Second) of Torts § 558 and Iowa common law, the action for Intentional Infliction of Emotional Distress is based on the provisions of Restatement (Second) of Torts § 46 (1965) and Iowa common law, and the action for Invasion of Privacy is based on the provisions of Restatement (Second) of Torts § 652 and Iowa common law.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter as the value exceeds the small claims jurisdictional amount ($6,500.00), and all procedural requirements have been met.

3.      Venue is appropriate in this court as all actions complained of herein occurred in Red Oak, Montgomery County, Iowa and Montgomery County Memorial Hospital is in Montgomery County, Iowa.

## PARTIES

4.      Plaintiff, Kyle Stokke (hereinafter "Stokke"), was at all times material hereto a citizen of the United States and a resident of Montgomery County, Iowa. Since the date of the incident,

Stokke has been forced to relocate to a different town and county.  Stokke currently resides at 311 18th Street, Spirit Lake, Dickinson County, Iowa 51360.

5.      Defendant, Montgomery County Memorial Hospital (hereinafter "MCMH"), is, and was at all times material hereto, a county owned hospital, organized and operated under the laws of the State of Iowa, with its principal place of business located at 2301 Eastern Avenue, Red Oak, Montgomery County, Iowa.

6.      Defendant, David Earl Abercrombie (hereinafter "Abercrombie"), is, and was at all times material hereto, Chief Executive Officer of Montgomery County Memorial Hospital.  Upon information and belief, Abercrombie resides at 307 Eastern Avenue, Stanton, Montgomery County, Iowa.

7.      Defendant, Phyllis Drake (hereinafter "Drake"), is, and was at all times material hereto, an employee of Montgomery County Memorial Hospital, and Stokke's immediate supervisor. Upon information and belief Drake resides at 510-250th Street, Scranton, Greene County, Iowa.

8.      Defendant, Kasey Mueller (hereinafter "Mueller"), is, and was at all times material hereto, an employee of Montgomery County Memorial Hospital.  Mueller's current residence is unknown. Mueller was also the physician assistant for Michael Mahoney, M.D. Mahoney was Stokke's primary care physician and Mueller often provided medical care to Stokke during his personal physician appointments.

9.      Defendant, Kim Robinson (hereinafter "Robinson"), is, and was at all times material hereto, an employee of Montgomery County Memorial Hospital and served as manager of the Human Relations Department.  Upon information and belief Robinson resides at 1107 Eastern Avenue, Red Oak, Montgomery County, Iowa.

10.      Plaintiff is informed, believes, and thereon alleges that at all times relevant, each Defendant, was the agent, servant, representative and/or employee of MCMH; and that in doing the things hereinafter alleged, each Defendant was acting within the course and scope of his, her, or its authority as such agent, servant, representative and/or employee, with the permission, knowledge, consent and ratification of MCMH. Unless otherwise indicated, all Defendants are collectively referred to herein as the "Defendants".

2

## GENERAL ALLEGATIONS

11.      Stokke began working for MCMH as a respiratory therapist in the year 2007.

12.      Stokke was hired by MCMH as a respiratory therapist; his starting wage was $21.10 per hour.

13.      Abercrombie was MCMH's Chief Executive Officer during Stokke's employment as relevant to this litigation.

14.      Drake was Stokke's immediate supervisor during the term of Stokke's employment as relevant to this litigation.

15.      During his employment, Stokke received raises increasing his hourly rate to $23.45 an hour.  He continued to work as a respiratory therapist and was responsible for patient care.  When working weekends (his primary shift), Stokke often earned $27.00 - $28.00 per hour.  Stokke's work schedule was to provide every ninth weekend off however, Stokke only received two weekends off of work per year. Stokke was constantly on-call five to seven days a week, also on holidays.

16.      Stokke suffers from a medical condition commonly known as ankylosing spondylitis (hereafter A.S.).  The disease is an incurable genetic condition causing severe inflammation and pain throughout the joints in the body.  Multiple methods of pain management must be employed in order to maintain mobility.  Stress aggravates the condition.  At the time of hiring and at all time relevant to this case, Stokke has endured the symptoms/pain caused by this condition.

17.      On or about the 11th day of March 2018, Stokke fell to one knee while walking towards the pavilion in the hospital.

18.      Two nurses, Amanda Watson and Amanda Baldwin, witnessed Stokke's fall and attempted to provide assistance.

19.      Stokke contacted Drake via text message to inform her of the incident. Drake knew of Stokke's medical condition and was aware that Stokke's knee had given out on other occasions.

20.      Drake informed Stokke that he needed to report to the emergency room for evaluation to determine if he should file a workman's compensation claim.

21.      While reporting to the emergency room, there were two (2) patients being admitted to the hospital that required emergency/immediate respiratory treatment.

22.     Consulting physician Edward Pillar (hereinafter "Dr. Pillar"), authorized Stokke putting one patient on a bi-pap machine at low settings. Once the patient was stabilized, Stokke assisted in moving the patient to the ambulatory care unit.

23.     Following, Stokke returned to the emergency room and, upon request, assisted a nurse anesthetist intubate the second trauma patient.

24.     After assisting other hospital staff in caring for their patients, Stokke had an x-ray completed of his knee by physician assistant, Cassandra Mueller (hereinafter "Mueller").

25.     Thereafter Stokke returned to the patient in the ambulatory care unit to complete an arterial blood gas analysis.

26.     Upon completion of the ABG, Stokke returned to the emergency room and was informed by Mueller that she needed to see him privately.

27.     Stokke accompanied Mueller to a private room for discussion.   Mueller was accompanied by nurse, Dale Stogdill, who was present for the entire conversation.  Mueller informed Stokke that he was being sent home as he was a hazard to his patients.

28.     At no time during the conversation did Stokke make verbal threats or behave in a threatening manner.  Stokke left the hospital as requested.

29.     Shortly after sending Stokke home, Mueller reported to Drake and Robinson that Stokke threatened to "shoot up the place" and that Stokke stated, "there will be some changes here next week", while smirking.

30.     Upon information and belief, Mueller also relayed private medical information, gleaned during her prior medical treatment of Stokke, to Drake and Robinson in order to support her allegations that Stokke was dangerous.

31.     Drake and Robinson did not contact the police, did not interview Dale Stogdill, who was also present in the room when Stokke was sent home, and did not contact hospital administration regarding the alleged threat.

32.     The next day, March 12, 2018, when Abercrombie arrived at the hospital, Robinson reported Mueller's allegation that Stokke threatened to "shoot up the place".

33.     Immediately thereafter, Abercrombie began calling all department heads and administrative team members for the hospital and relaying the alleged threat "to shoot up the place".

Staff was specifically told that Stokke presented a "credible threat" to employees, that "a heightened sense of vigilance was necessary", that Stokke's "employee badge access had been discontinued", and that they should contact 911 if they saw Stokke on the hospital campus. Those notified included, but were not limited to, Richard Leinen, Chief Financial Officer; Diane McGrew, Chief Nurse Executive; Darwin Peterson, Chief of Medical Staffing, Robert Kloewer, Risk and Safety Management and all administrative team members. Abercrombie also called Red Oak police chief, Justin Rhamy and reported the alleged threat.

34.     While meeting with hospital executives, Abercrombie sent Robinson and Drake back out into the hospital to warn other hospital employees to be on the lookout for Stokke. Robinson and Drake relayed Stokke's alleged threat to multiple hospital employees including, but not limited to: Tina Alder, Kayla Duysen, Jennifer Martin, Linda Newsome, Katie Sickles, Allana Moore, Kylie Bowen and Cathi DeAnda.

35.     Abercrombie contacted Stokke's private physicians, Michael Mahoney, David Steele, and Eric Paulson, relayed the alleged threats, requested emergency committal of Stokke and canceled Stokke's upcoming personal physician appointment.

36.     At the time all of these conversations were taking place, Dale Stogdill, the nurse in the room with Mueller and Stokke still had not been interviewed by any hospital staff or law enforcement officers. There was no evidence, from anyone other than Mueller, that Stokke had made verbal threats or had behaved in a threatening manner.

<u>COUNT I- LIBEL (SLANDER) PER SE</u>

37.     Plaintiff repleads paragraphs one (1) through thirty-six (36) as if fully set forth herein.

38.     Defendants Abercrombie, Robinson, Drake, and Mueller orally communicated to Plaintiff's co-workers, patients, law enforcement, security officers, medical care providers and/or prospective employers, false statements about the Plaintiff, claiming that Stokke made terroristic threats against /towards MCMH and its occupants. Alleged statements included, but are not limited to, allegations that Stokke was going to "shoot up the place" and that there were, "going to be changes next week". Upon information and belief, such conversations were conducted with all department heads administrative team members, hospital staff members and law enforcement officers (as set forth above).

5

39.   Prior to interviewing nurse, Dale Stogdill, the only other person in the room with Mueller, Defendants Abercrombie, Drake, Mueller, Robinson contacted the Plaintiff's personal physician, Michael Mahoney M.D., and requested that the doctor commit the Plaintiff, claiming he was a danger to himself and others.  One or more of the listed Defendants relayed the alleged terroristic threats.

40.   Defendants' allegations are false and were known by Defendant to be false at the time they were made; in the alternative, the allegations were made with a reckless disregard for whether or not they were false.

41.   The communications are defamatory per se in that the Stokke could have been charged with an indictable crime and that such communications have injured him in his business or trade and in his social interactions within the community; the statements attack Stokke's veracity and reputation as an esteemed professional in Montgomery County.

42.   Defendants Abercrombie, Robinson, Drake and Mueller caused these false and defamatory statements to be published to third parties inside and outside the hospital via email, memorandum and police report

43.   In addition to orally relaying the alleged threats to hospital employees, Abercrombie requested a police presence outside the hospital and warned employees to report any sightings of Stokke to the police.

44.   Around 5:00 p.m., March 12, 2018, Stokke and Dr. David Steele came to the hospital to meet with Dr. Michael Mahoney for an evaluation/appointment.  This was the first effort made by anyone to discuss the allegations with Stokke.  Abercrombie requested a strong police presence at the hospital.  Officers were set up in the corridor outside Mahoney's office; other hospital personnel could see the police guarding the hallway.

45.   Following the meeting with Stokke, Dr. Steele and Dr. Mahoney informed Abercrombie that Stokke denied all allegations and that neither believed Stokke to be a threat to himself or others. The doctors declined to seek committal of Stokke.

46.   Despite the doctors' reassurance and Stokke's denial, Abercrombie met with all administrative team members and safety heads the next morning.  At the meeting, in-depth details regarding Stokke's "threats" were relayed by Abercrombie and Robinson.  Department heads were

6

told to break up and meet with their administrators, to determine their departments' safety concerns and to review the hospital's active shooter plan.

47.   Abercrombie also requested a meeting with Stokke on or about March 13, 2018. When Stokke arrived for the meeting, he was escorted by the police to and from the meeting in Abercrombie's office. The police escort was witnessed by patients and co-workers and reinforced the implication that Stokke was a dangerous individual.

48.   The false accusations were attacks on the integrity and moral character of Stokke and gave the impression that he was a dangerous man to be feared by others.

49.   The false accusations were directly related to Stokke's ability to perform his employment duties at MCMH. Reliance on the false accusations was the cause of Stokke's termination from MCMH. On March 23, 2018, Stokke was personally terminated by Abercrombie. At the time of termination, Abercrombie informed Stokke that he was being terminated due to "threats made against his co-workers". The false accusations damaged the reputation of Stokke within MCMH as well as within the Montgomery County, Iowa community.

50.   Following the accusations, Stokke noticed law enforcement officers following him through various areas in the community. Individuals who once claimed to be his friends, suddenly stopped talking to him, avoided him in the grocery store, and refused to make eye contact. Parents at his wife's daycare expressed concern for their children's safety. Children at school began to bully Stokke's young son.

51.   The statements are entirely false as they pertain to Stokke, and are defamatory, slanderous on their face, and exposed Stokke to the hatred, contempt, ridicule and the obloquy of the Montgomery County, Iowa community.

52.   Prior to the spread of these defamatory statements, Stokke had a stellar employee reputation: he was timely, organized, hard-working, knowledgeable, calm under pressure and attentive to his patient's needs. Stokke had received commendations and recommendations from both peers and patients.   These slanderous statements made to members of the medical community in Montgomery County, Iowa, were understood by those who heard them in a way that defamed the reputation of Stokke as a well-respected, hard-working professional; the statements alleged and implied that  Stokke was a threat and danger to everyone within the hospital and community.

53.   The false and defamatory statements and communications of Defendant were not privileged.

54.   Upon information and belief, Defendants, each of them, failed to use reasonable care to determine the truth or falsity of the statements to wit: written statements detailing the specific allegations were never requested from Mueller; the other witness present during Mueller's interactions with Stokke was not interviewed; the police were not contacted at the time of the "incident" to interview witnesses or to gather evidence; Stokke was never interviewed by police nor was any criminal investigation conducted, and almost 24 hours passed before hospital authorities were decided to act upon the "threats"

55.   Upon information and belief, the wrongful conduct of the Defendants, each of them, was a substantial factor in causing Stokke harm, including but not limited to harm to Stokke's trade, profession, and/or occupation, expenses Stokke had to pay as a result of the defamatory statements, harm to Stokke's reputation, harm to the doctor/patient relationship Stokke enjoyed with his primary care physician, harm to Stokke's mental and physical health, harm to Stokke's wife/child and the families' standing in the community and all other harms assumed by law.

56.   Upon information and belief, by engaging in the above conduct, Defendants, each of them, acted with malice, oppression, and/or fraud, entitling Stokke to exemplary and punitive damages in addition to compensatory damages.

57.   Plaintiff was defamed and damaged in name, reputation and business.

58.   Plaintiff also incurred costs, expenses, counsel fees, loss of time and inconvenience in bringing this action.

### COUNT II- LIBEL (SLANDER) PER QUOD

59.   Plaintiff repleads paragraphs one (1) through fifty-eight (58) (as if fully set forth herein.

60.   Defendants Abercrombie, Robinson, Drake and Mueller have orally communicated to Plaintiff's co-workers patients, law enforcement (Justin Rhamy), security officers, medical care providers, and/or prospective employers (as set forth above) false statements about the Plaintiff having made terroristic threats against towards MCMH and its occupants.

61.   Defendants' allegations are false and were known by Defendants to be false at the time they were made; or with a reckless disregard for whether or not they were false.

62.   The false and defamatory statements and communications of Defendants were not privileged.

63.   The statements made by the Defendants and adopted and propagated by MCMH and the county of Montgomery, resulted in damage to Stokke's reputation and to his perceived capabilities in his profession.  Further, Stokke was exposed to hatred and contempt within his community, he was terminated from MCMH, and he experienced declines in his physical and mental health.

64.   Stokke's physical condition, A.S., is exacerbated by stress and following these slanderous allegations, Stokke experienced symptoms including, but not limited to: enhanced pain in his joints, headaches, fatigue, insomnia, nausea, anxiety, and depression.

65.   Additionally, by barring Stokke from the hospital campus, Abercrombie barred Stokke from attending appointments with his primary care physician.  Meetings with Dr. Mahoney were critical to Stokke's care because his medications often required dosage modifications and/or substitutions.  Stokke was limited to speaking to Dr. Mahoney or his staff on the phone and attempting to verbally convey all symptoms and issues.  This was especially difficult because the slanderous allegations caused many hospital employees, including, but not limited to, Mueller to avoid all contact with Stokke.

66.   Stokke's termination left him without the means to financially support his family.  The damage done to Stokke's reputation in a small town led to the decision to sell the family home, take his son out of school and move several hours away.  Prior to the slander, Stokke had no intention of moving, however, after his termination, he was left feeling as if he had no choice.

67.   Upon information and belief, each Defendant failed to use reasonable care to determine the truth or falsity of the statements. Upon information and belief, the wrongful conduct of the Defendants, each of them, was a substantial factor in causing Stokke harm, including but not limited to harm to Stokke's trade, profession, and/or occupation, expenses Stokke had to pay as a result of the defamatory statements, harm to Stokke's reputation, harm to the doctor/patient relationship Stokke enjoyed with his primary care physician, harm to Stokke's physical and mental health, harm to Stokke's wife/child and the families' standing in the community and all other harms assumed by law.

## COUNT III-LIBEL (SLANDER) BY IMPLICATION

68.    Plaintiff repleads paragraphs one (1) through sixty-seven (67) as if fully set forth herein.

69.    Defendants Abercrombie, Robinson, Drake and Mueller slandered the Plaintiff by implication.

70.    By information or belief, defendants left out facts, ignored other evidence, combined statements in a way that intentionally conveyed false meaning, or behaved in a manner that gave patients and staff a false concern for their safety

71.    Defendants Abercrombie, Robinson, and Drake participated in several meetings on or about the 12th day of March 2018 wherein the Plaintiff was a subject matter of discussion.

72.    Defendants Abercrombie, Robinson, Drake and Mueller implied that the hospital was on lockdown because the Plaintiff made terroristic threats toward the hospital staff/occupants.

73.    Defendants Abercrombie, Robinson, Drake and Mueller were aware that the Plaintiff was coming to the hospital to meet his personal physician, Dr. Mahoney.

74.    Defendant Abercrombie contacted law enforcement implying that the Plaintiff was a threat to the hospital staff and patients.

75.    Upon Plaintiff's arrival to the hospital, there were five (5) police vehicles present.

76.    On or about the 13th day of March 2018, the Plaintiff returned to MCMH for an appointment with Dr. Mahoney.

77.    Defendant Drake requested that the Plaintiff visit Defendant Abercrombie following the appointment with his physician.

78.    Plaintiff was escorted by sheriffs through the hospital, in front of all of his co-workers and peers, to and from his appointment with Abercrombie.

79.     Defendant Abercrombie implied that the Plaintiff was a danger to others by requesting the presence of law enforcement when the Plaintiff attended his appointments with his physician

80. Following Stokke's termination, his son required surgery at MCMH.  Stokke was not allowed to attend his child's surgery.  Stokke's wife was supervised while she attended the surgery by Defendant Abercrombie.  Such behavior implied that Stokke and his wife were dangerous and could not be trusted.

## COUNT IV-INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81.     Plaintiff repleads paragraphs one (1) through eighty (80) as if fully set forth herein.

82.     Defendants Abercrombie, Robinson, Drake and Mueller knowingly made outrageous false statements alleging the Plaintiff made terroristic threats and insinuating that he was a dangerous man to be feared. Such conduct by the individual Defendants went beyond all possible bounds of decency and may be regarded as atrocious and utterly intolerable in a civilized community.

83.     Defendant Abercrombie had the Plaintiff banned from the property where his primary care physician's office is located, preventing Stokke from obtaining medical treatment critical to his care and well-being.

84.     Defendant Abercrombie banned Stokke from the property thus preventing Plaintiff from attending his young son's surgery.

85.     Stokke's spouse was monitored by Defendant Abercrombie while she was in the hospital for the child's surgery, thus further emphasizing the Stokke families' danger to hospital employees

86.     Even after receiving assurances that Stokke was not a threat to himself or others (from two physicians employed by the hospital), Abercrombie required all departments to practice active shooter scenarios.

87.     Defendant Abercrombie, Robinson, Drake and Mueller's conduct was outrageous and done with the intent to, or reckless disregard for the probability of, causing Plaintiff emotional distress.

88.     Stokke is suffering severe or extreme emotional distress including, but not limited to: grief, shame, humiliation, embarrassment, anger, disappointment and worry.  No reasonable person should be forced to suffer this emotional burden.

89.     As a proximate result of Defendants Abercrombie, Robinson, Drake and Mueller's intentional or reckless acts, Plaintiff suffered this severe or extreme emotional distress.

90.     Additionally, Defendant Abercrombie, Robinson, Drake and Mueller's outrageous conduct is the actual and proximate causation of aggravated medical decline and enhanced physical pain.

## COUNT V-INVASION OF PRIVACY

91.     Plaintiff repleads paragraphs one (1) through ninety (90) as if fully set forth herein.

92.   Upon information and belief, Defendants Abercrombie, Robinson, Drake and Mueller intentionally intruded into matters of Plaintiff's mental and physical health and relayed such information in a manner that impaired Plaintiff's peace of mind and comfort.

93.   Mueller is the physician assistant for Stokke's primary care physician, Michael Mahoney M.D. As such, Mueller provided medical care for Stokke related to physical and mental health. Mueller was aware of potential side effects caused by Stokke's medications; his emotional struggles with his debilitating medical condition and the physical pain Stokke endured on a daily basis.  Upon information and belief, Mueller disclosed this private medical information to Drake, Robinson, Abercrombie and others.

94.   Abercrombie obtained information regarding Stokke's personal physician appointment and unilaterally canceled the appointment.

95.   Plaintiff had a right to expect privacy.

96.   Plaintiff's right to privacy in respect to Plaintiff's physical, mental and emotional condition was unreasonably and offensively invaded.

97.   Defendant Abercrombie and Mueller's intrusion was highly offensive to Stokke and would be highly offensive to a reasonable person and such invasion is a legitimate concern to the public.

98.   As a proximate result of Defendants Abercrombie and Mueller's invasion of Plaintiff's privacy, Plaintiff has sustained injuries and damages including, but not limited to mental anguish, humiliation, embarrassment and inconvenience.

**WHEREFORE**, Plaintiff prays for judgment against all Defendants for all general, special, exemplary and punitive damages as allowed by law in sum to be proven at trial; that the Defendants' be held jointly and severally liable for the damages awarded herein; that the Defendants' be assessed the costs and fees incurred herein including, but not limited to Plaintiff's attorney fees; that a judgement be entered against the Defendants' with interest as provided by statute; and for such other and further relief as the Court may deem just and proper in the premises.

**JURY DEMAND**

Plaintiff demands a jury trial on all counts to be tried herein.

Respectfully submitted this 14th day of January 2020.

By: _____/s/ Kyle E. Focht_____
Kyle E. Focht – ATT00003968
Focht Law
229 South Main Street
Council Bluffs, Iowa 51503
Telephone: (712) 828-4896
Facsimile : (712) 355-5260
E-mail:  kfochtlaw@gmail.com
Attorney for Plaintiff